IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-01890-PAB

ADAM K. SUTHERLAND,

        Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

        Defendant.

---

## ORDER

---

This matter is before the Court on plaintiff Adam Sutherland's complaint [Docket No. 1], filed on July 20, 2012.  Plaintiff seeks review of the final decision of defendant Carolyn W. Colvin (the "Commissioner") denying plaintiff's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401-33 and 1381-83c.[1]  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 405(g).

## I.  BACKGROUND

On January 21, 2009, plaintiff applied for disability benefits under Title II and Title XVI of the Act.  R. at 14.  Plaintiff alleged that he had been disabled since September 23, 2008.  *Id.*  After an initial administrative denial of his claim, plaintiff received a hearing before an Administrative Law Judge ("ALJ") on November 3, 2010.

---

[1]The Court has determined that it can resolve the issues presented in this matter without the need for oral argument.

*Id*. On December 17, 2010, the ALJ issued a decision denying plaintiff's claim. *Id*. at 24.

The ALJ found that plaintiff had the following severe impairments: "left shoulder disorder, left elbow disorder, bipolar disorder with psychotic features, personality disorder, and polysubstance use and dependence including alcohol, hallucinogens, methamphetamines, and marijuana." *Id*. at 17. The ALJ found that plaintiff's impairments meet listings 12.04 (affective disorders), 12.08 (personality disorders), and 12.09 (substance addiction disorders) of C.F.R. Part 404, Subpart P, Appendix 1. *Id*. at 17. The ALJ further found that, if plaintiff stopped using substances, his remaining impairments would qualify as severe, but would no longer meet any of the listed impairments and that plaintiff would have the residual functional capacity ("RFC") to

> perform work at all exertional levels with the following exertional and non-exertional limitations: he is able to do frequent pushing and pulling with his left non-dominant upper extremity, can do occasional reaching above the shoulder with his left non-dominant upper extremity; mentally, the claimant cannot perform any work involving safety operations or responsibility for the safety of others; the claimant should not have any direct exposure in the workplace to alcohol, marijuana, and illegal drugs; and the claimant is able to have only occasional, non-intense interaction with supervisors, co-workers, and the public.

R. at 19. Based upon this RFC and in reliance on the testimony of a vocational expert ("VE"), the ALJ concluded that the claimant would be able to perform his past relevant work if he were to stop using substances. R. at 24.

The Appeals Council denied plaintiff's request for review of this denial. R. at 1. Consequently, the ALJ's decision is the final decision of the Commissioner. Plaintiff argues that the ALJ erred in (1) failing to properly apply the five-step evaluation process in determining whether substance abuse could be a material factor contributing to

2

plaintiff's disability; (2) finding that plaintiff is dependent on methamphetamines; (3) failing to determine what plaintiff's RFC would be if he continued to use alcohol and other substances; (4) failing to discuss the opinions of several treating physicians included in plaintiff's medical record; and (5) relying on impermissible factors in assessing plaintiff's credibility.

## II. ANALYSIS

### A.  Standard of Review

Review of the Commissioner's finding that a claimant is not disabled is limited to determining whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *See Angel v. Barnhart*, 329 F.3d 1208, 1209 (10th Cir. 2003).  The district court may not reverse an ALJ simply because the court may have reached a different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in his decision.  *See Ellison v. Sullivan*, 929 F.2d 534, 536 (10th Cir. 1990).  "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).  Moreover, "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).  The district court will not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty*, 515

3

F.3d at 1070. Nevertheless, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### B.  The Five-Step Evaluation Process

To qualify for disability benefits, a claimant must have a medically determinable physical or mental impairment expected to result in death or last for a continuous period of twelve months that prevents the claimant from performing any substantial gainful work that exists in the national economy. 42 U.S.C. § 423(d)(1)-(2). Furthermore,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A) (2006). The Commissioner has established a five-step sequential evaluation process to determine whether a claimant is disabled. 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988). The steps of the evaluation are:

> (1) whether the claimant is currently working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets an impairment listed in appendix 1 of the relevant regulation; (4) whether the impairment precludes the claimant from doing his past relevant work; and (5) whether the impairment precludes the claimant from doing any work.

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (citing 20 C.F.R. § 404.1520(b)-(f)). A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis. *Casias v. Sec'y of*

*Health and Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).

The claimant has the initial burden of establishing a case of disability.  However, "[i]f the claimant is not considered disabled at step three, but has satisfied her burden of establishing a prima facie case of disability under steps one, two, and four, the burden shifts to the Commissioner to show the claimant has the residual functional capacity (RFC) to perform other work in the national economy in view of her age, education, and work experience."  *See Fischer-Ross v. Barnhart,* 431 F.3d 729, 731 (10th Cir. 2005); *see also Bowen v. Yuckert,* 482 U.S. 137, 146 n. 5 (1987).  While the claimant has the initial burden of proving a disability, "the ALJ has a basic duty of inquiry, to inform himself about facts relevant to his decision and to learn the claimant's own version of those facts." *Hill v. Sullivan,* 924 F.2d 972, 974 (10th Cir. 1991).

### C.  Relevant Facts

On January 11, 2008, plaintiff had an outburst in which he destroyed his laptop computer because he was "wasting too much time on it" and got into an argument with his mother.  R. at 378.  When she noticed there were red marks around plaintiff's neck, she brought him to the hospital, where he told staff had been "messing around with a rope," but denied trying to hang himself.  *Id.*  Physician Nathan Watkins determined plaintiff was not suicidal and diagnosed him with adjustment disorder.  *Id.*  Plaintiff tested positive for marijuana and reported drinking one six-pack of beer per week.  *Id.*

In July 2008, plaintiff met with Stephen Bishop, a psychiatrist he had met with several times in 2006 and 2007, R. at 391-92, who noted that plaintiff's moods were up and down and that he was drinking and using marijuana on an ongoing basis.  R. at

389.  On July 19, 2008, Dr. Bishop completed a Statement of Dependent Eligibility form in which he found that plaintiff suffers from "severe bipolar disorder," "dramatic mood shifts," "poor concentration," paranoia, disorganized thinking, and an inability to complete tasks.  R. at 390.  Dr. Bishop's notes from April 2009 indicate that he warned plaintiff that "substance use is incompatible with him getting better" and advised him to seek help for his chemical dependency, but that plaintiff refused to do so.  *Id*. at 389.

On May 20, 2009, plaintiff was admitted to the New Mexico Behavioral Health Institute because of suicidal ideation.  R. at 394.  He stated that he was looking for his girlfriend, but couldn't find her, and that he felt like jumping off a bridge.  *Id*.  On intake, physician Anthony Martinez noted that plaintiff "uses marijuana regularly, has experimented with drugs but does not use them regularly, drinks beer every other day but denies heavy alcohol use."  *Id*.  Psychiatrist Barbara Troje evaluated plaintiff's mental status and found he had poor hygiene, slow psychomotor activity, normal speech, a dysphoric mood, a restricted and angry affect, and coherent thought processes.  R. at 399.  Plaintiff stated that he had previously been hospitalized for "mental breakdowns" and that he experienced both auditory and visual hallucinations. R. at 397, 399.  With respect to plaintiff's substance abuse, Dr. Troje noted plaintiff's "acknowledg[ment] that he smokes pot everyday to make him feel better."  R. at 397. She also noted that plaintiff said he "smokes marijuana whenever he gets a chance and alcohol.  He may drink 2 or 3 beers at a time, but cannot recall the last time he drank any alcohol."  *Id*.  Dr. Troje diagnosed plaintiff with psychotic disorder (not otherwise specified) and cannabis and alcohol abuse.  R. at 399.  She found he had a Global

6

Assessment of Functioning ("GAF") score of 40.[2]  *Id*.  On May 29, 2009, plaintiff was discharged "in good spirits," stating that he was not a danger to himself or others and was ready to be discharged.  R. at 401.

On August 14, 2009, plaintiff was examined by state agency psychologist Brett Valette.  R. at 404.  Plaintiff reported being diagnosed with bipolar disorder at the age of fourteen.  *Id*.  He stated that, "at the age of 18, he took too potent a dose" of lysergic acid diethylamide ("LSD"), was hospitalized for hallucinations and paranoia, and has "never been the same since."  R. at 404.  Plaintiff reported the following daily activities: catching the bus, skateboarding, looking for a job, drawing, playing with his dogs, talking on the phone, doing laundry, grocery shopping, cooking, and bathing himself.  R. at 405.  Dr. Valette noted that:

> The client said he has had some problems with alcohol.  He says he drinks beer to try to deal with the pain.  He said he drank two beers, three nights ago.  He also uses pot.  He said he uses pot to deal with the pain.  He has a history of using LSD and mushrooms.  He has not used any of the hard drugs since 2003.

R. at 405.  With respect to psychiatric symptoms, plaintiff reported racing thoughts and

---

[2]"The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning."  *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000)).  A GAF score between 31 and 40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."  *Id*.

psychotic features during manic episodes, talking to himself, hearing voices, hallucinations in his peripheral vision, and feeling like he could "project [himself] out into the future or out into space." R. at 405-06. Dr. Valette diagnosed plaintiff with cannabis abuse and polysubstance abuse, but found that his polysubstance abuse was in full remission. R. at 406. Dr. Valette noted the possibility of alcohol abuse and bipolar disorder ("Rule out alcohol abuse," "Rule out bipolar II disorder"). *Id*. He also noted that plaintiff had "a history of some conduct disorder and some mild antisocial behavior." R. at 407. He found plaintiff to have a GAF score of 65.[3] *Id*.

On August 23, 2009, state agency psychiatric consultant Mark Suyeishi evaluated the evidence in plaintiff's file up to August 18, 2009 and completed a Psychiatric Review Technique on plaintiff's behalf. R. at 342-55. Dr. Suyeishi opined that plaintiff suffers from a psychotic disorder and a substance abuse disorder, but that these impairments are not severe. R. at 342-43, 350 ("Psychotic D/O (with polysubstance and alcohol abuse)," "Cannibus [sic] abuse, R/O alcohol and polysubstance abuse"). Dr. Suyeishi noted that bipolar disorder was a possible diagnosis. R. at 345 ("R/O bipolar"). Dr. Suyeishi concluded that "claimant's psychosis is related to drug/alcohol use, when not taking drugs/alcohol he is not severe." R. at 354.

On February 18, 2010, plaintiff was admitted to a mental health facility in

---

[3]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *Keyes-Zachary*, 695 F.3d at 1162 n.1.

Humboldt County, California "as a danger to [him]self and gravely disabled."  R. at 409.

He was brought to the hospital because he was acting disoriented, stating someone

was trying to kill him, and threatening to kill himself.  R. at 411.  His appearance was

dirty and disheveled, his behavior was disorganized, and his psychomotor activity was

hyperactive.  *Id*.  He reported being chased by demons.  *Id*.

A February 19, 2010 assessment completed by social worker Laurie Sims

indicates plaintiff stated: that he wanted to smoke a "fucking joint, this is California," "I

don't take medications, I smoke pot"; and "I want to end it, there is nothing in this world

for me."  R. at 414.  Ms. Sims noted that plaintiff was currently using substances on an

occasional basis.  R. at 415.  Ms. Sims opined plaintiff suffers from non-specific

psychosis, as well as social stressors, including homelessness, unemployment, lack of

social support, and polysubstance abuse.  R. at 416-17.  She concluded that

> He appears to have learned to use manipulation as a means to survive
> outside his families' environment. . . .  This writer did not observe him
> responding to any internal stimuli experiencing any delusions.  He appears
> to be malingering.  He is stating clearly that he has nothing to live for and is
> also stating the only expectation he has of SV is to give him marijuana.  He
> is overly dramatic when he says he has no reason to live saying tearfully, "It's
> all my parents' fault."  He seems immature.

R. at 417.

On March 2, 2010, staff psychiatrist Ruby Bayan completed a discharge

summary report for plaintiff, in which she noted that plaintiff

> came to Humboldt County 2-3 weeks ago for unclear reason other than the
> possibility of getting a 215 card since he takes [Tetrahydrocannabinol
> ("THC")][4] and was prescribed the same in Colorado.  The patient admitted

---

[4]THC refers to the "active isomers present in *Cannabis*, having been isolated
from marijuana."  Stedman's Medical Dictionary 404330 (27th ed. 2000).

to using drugs including methamphetamine (meth) and acid, but timeline was unclear. He also claimed that he used alcohol, unsure of the last drink.

R. at 409-11. She noted that "the patient uses THC but admitted to using meth and acid and alcohol." R. at 409. With respect to plaintiff's mental status, Dr. Bayan reported that he was disheveled with poor hygiene, had hyperactive psychomotor activity but normal speech, had delusions that someone was trying to kill him but denied suicidal or homicidal ideation, admitted to auditory hallucinations, was goal-directed in his thinking, had impaired judgment and insight, and was oriented to time and place, but not situation. R. at 409. She stated that plaintiff "continued to be floridly psychotic for the first two days of hospitalization" and that, even after he began taking medication, he "continued to be unpredictable with inappropriate language, and at one point the evaluation had to be terminated because of cursing at this writer." *Id*. at 410. She found he had no auditory hallucinations at the time he was discharged. *Id*. Dr. Bayan diagnosed plaintiff with schizoaffective disorder and antisocial personality disorder, exacerbated by non-compliance with his medication. *Id*. He had a GAF score of 20 on admission and 48 at discharge.[5] *Id*. Dr. Bayan concluded that the "[p]rognosis is guarded. The patient was noncompliant with previous treatment. He may not even make it back home because of poor motivation." R. at 411.

On March 16, 2010, psychiatrist George Kalousek, who initially evaluated plaintiff in September 2009 and met with him on several occasions in 2010, completed a

---

[5]A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Keyes-Zachary*, 695 F.3d at 1162 n.1.

Psychiatric Review Technique and Mental Impairment Questionnaire on plaintiff's behalf.  R. at 357-76.  On the Psychiatric Review Technique, Dr. Kalousek opined that plaintiff met the listings for psychotic disorders, affective disorders, anxiety-related disorders, and substance addiction disorders.  R. at 357.  He found that plaintiff suffered from hallucinations, grossly disorganized behavior, incoherent thought associated with inappropriate affect, emotional withdrawal, depressive syndrome, and manic syndrome.  R. at 359-60.  He diagnosed plaintiff with schizoaffective disorder, bipolar type.  *Id*.  With respect to plaintiff's substance use, Dr. Kalousek found that plaintiff had abused THC but had not experienced "[b]ehavioral changes or physical changes associated with the regular use of substances."  R. at 365.  He found that plaintiff has moderate restrictions in activities of daily living; marked difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and four or more repeated episodes of decompensation, each of extended duration.  R. at 367.  He also found that a minimal change in plaintiff's environment would likely cause him to decompensate.  R. at 368.

On the Mental Impairment Questionnaire, Dr. Kalousek found that plaintiff had mild restrictions in activities of daily living, moderate difficulty maintaining social functioning, marked difficulty in maintaining concentration, and one or two episodes of decompensation within the previous twelve months.  R. at 374.  He opined that alcohol and substance abuse do not contribute to plaintiff's limitations.  R. at 376.

At the administrative hearing on November 3, 2010, plaintiff testified that he had used LSD when he was eighteen; that he had smoked marijuana in the past but, since October 2009, has used it mostly in the form of a cream applied to his shoulder; that he

11

has not used any other illegal drugs; and that he drinks approximately nine beers a week in the wintertime but does not "get out of control." R. at 31-41.  Plaintiff presented a medical marijuana registry card, issued on July 13, 2010, to the ALJ.  R. at 34. Plaintiff also stated that in the spring of 2009, he "think[s] [he] got dosed up by a jealous brother, who gave me too much acid on purpose," inducing a manic hallucinatory state that culminated in his May 2009 admission to a mental health facility in New Mexico.  R. at 50-51.  Plaintiff testified that "most of the time" his manic episodes are not induced by drugs or alcohol.  R. at 52.  Plaintiff testified that he was truthful with his treating psychiatrist, George Kalousek, regarding his history of drug use and his medical marijuana license.  R. at 56.

### D.  The ALJ's Decision

At step one, the ALJ found that plaintiff has the severe impairment of polysubstance use and dependence, including alcohol, hallucinogens, methamphetamine, and marijuana.  R. at 17.  At step two, the ALJ found that this impairment meets the listing at 12.09: he stated that "claimant acknowledged that he uses marijuana when available and drinks beer every other day" and noted that plaintiff's toxicology screen during his February 2010 hospitalization was positive for THC.  *Id*. at 17-18.  In addition, the ALJ found at step two that, if plaintiff stopped using substances, his mental and physical limitations would remain severe but would no longer meet the criteria of the listings.  *Id*.  The ALJ explained that plaintiff

> can bathe and dress, do his own laundry, shop in stores, and engage in sports activities.  In social functioning, the claimant would have mild difficulties if the substance use was stopped.  The claimant is often inappropriate and emotionally labile, but usually gets along with others. With regard to concentration, persistence or pace, the claimant would have mild

difficulties if the substance use was stopped.  On testing, the claimant could recall 3 items after 5 minutes, could spell 'world' correctly backward and forward, and could do serial 3s. . . . the claimant would experience no episodes of decompensation if the substance use was stopped.  The claimant's toxicology screen was positive for cannabis when he was hospitalized in February 2010, and he acknowledges using other drugs.  A review of the record suggests that the claimant's suicidal thoughts are associated with substance use.

R. at 19 (internal citations omitted).  In support of his finding that plaintiff's suicidal thoughts were linked to substance abuse, the ALJ cited generally to the medical records from plaintiff's hospitalizations in May 2009 and February 2010.  R. at 19 (citing R. at 393-403, 409-27).  The ALJ accorded substantial weight to the opinions of Drs. Valette and Suyeishi on the basis that they were highly experienced psychiatrists with knowledge of Social Security disability assessment standards and that their opinions were consistent with the record as a whole.  R. at 22-23.

Plaintiff argues that the ALJ's finding that he suffers from a severe dependence on methamphetamine or from polysubstance abuse is not supported by substantial evidence.  Docket No. 14 at 18-19.  He further argues that the ALJ misapplied the standard set forth in 42 U.S.C. § 423(d)(2)(C) because he did not complete all five steps of the analysis before considering whether plaintiff would be disabled if he abstained from substance use.  Docket No. 14 at 14-17.  Finally, plaintiff argues that the ALJ's conclusion that plaintiff would not be disabled if he refrained from using substances is not supported by substantial evidence.  Docket No. 14 at 19-23.

The Commissioner counters that there was sufficient evidence to support a finding that plaintiff continues to use marijuana regularly and hard drugs occasionally.  Docket No. 15 at 17.  The Commissioner argues that the ALJ was not required to

proceed to steps four and five of the analysis once he determined at step three that, taking substance use into account, plaintiff is disabled.  Docket No. 15 at 15-17. Finally, the Commissioner argues that the ALJ's RFC determination was reasonably linked to the evidence in the record.  Docket No. 15 at 20-28.

Under the Social Security Act, an individual is not disabled "if alcoholism or drug addiction would . . . be a contributing factor material" to the determination of disability. 42 U.S.C. § 423(d)(2)(C).  To make this determination, an ALJ must first determine whether a claimant is disabled, taking his substance abuse into account, and must then consider whether the ALJ would make the same determination if the claimant stopped using drugs or alcohol.  20 C.F.R. § 404.1535; *Drapeau v. Massanari*, 255 F.3d 1211, 1214-15 (10th Cir. 2001).  An ALJ may not find claimant's substance abuse is material if "it is not possible to separate the mental restrictions and limitations imposed by" substance abuse from those caused by other mental disorders or if there is no acceptable medical source who can "project what limitations would remain if the claimant stopped using drugs or alcohol."  *Salazar v. Barnhart*, 468 F.3d 615, 623-24 (10th Cir. 2006).

An ALJ's "lay conclusion that drug use might be expected to affect plaintiff's ability to respond appropriately in the workplace, not otherwise tied to the medical record, is not substantial evidence."  *King v. Astrue*, No. 09-cv-02112-REB, 2010 WL 3720039, at *4 (D. Colo. Sept. 13, 2010) (citing *Winning v. Comm'r of Soc. Sec.*, 661 F. Supp. 2d 807, 823 (N.D. Ohio 2009)); *see also Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006) (remanding where ALJ incorrectly attributed claimant's bipolar disorder to substance abuse because "the medical literature, while noting a positive correlation

14

between the two conditions and speculating that alcohol may trigger bipolar symptoms, does not indicate that the disorder itself can be so caused"); *Vigil v. Astrue*, No. 11-cv-0255-WJM, 2012 WL 2523037, at *4 (D. Colo. June 29, 2012) (remanding case due to "complete lack of medical evidence regarding Plaintiff's mental health impairments when he is abusing alcohol and how those impairments might be affected if he stopped abusing alcohol"); *Abeyta v. Astrue*, No. 09-cv-02437-WJM, 2011 WL 2531256, at *6 (D. Colo. June 24, 2011) (in the absence of "medical evidence in the record separating out the effects of [drug and alcohol abuse] from other impairments, the ALJ should then have determined that Plaintiff's psychological and cognitive impairments were severe and that Plaintiff is disabled"). Moreover, "the fact that substance abuse aggravate[s] [a claimant's] mental illness does not prove that the mental illness itself is not disabling." *Kangail*, 454 F.3d at 629.

The opinion of a treating physician is generally entitled to greater weight than that of a non-treating physician because of the unique perspective derived from a treating relationship. 20 C.F.R. § 404.1527(c)(2). Thus, an ALJ must accord controlling weight to the opinion of a treating physician where that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Id*. Moreover, the opinion of a treating physician merits some measure of deference to be determined based on an application of the factors listed in 20 C.F.R. § 404.1527(c)(2), even if it is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2)(i)-(ii). Where the opinion of a treating physician is in conflict with that of a consultative physician, the "consultative physician's report should be examined to see if it outweighs the treating

physician's report, not the other way around." *Hamlin v. Barnhart*, 365 F.3d 1208, 1220 n.13 (10th Cir. 2004) (internal citations omitted).  "[F]indings of a nontreating physician based upon limited contact and examination are of suspect reliability." *Frey v. Bowen*, 816 F.2d 508, 515 (10th Cir. 1987).

The ALJ's finding that plaintiff suffers from polysubstance abuse is linked to substantial evidence in the record, namely, multiple diagnoses of cannabis abuse and possible alcohol abuse, as well as plaintiff's own references to using a variety of drugs. *See, e.g.*, R. at 357, 365, 378, 389, 394, 397, 405, 409, and 414.  After finding that plaintiff suffers from substance abuse, the ALJ applied the correct legal standard by first determining that plaintiff currently suffers from a disability and then considering whether that disability would persist in the absence of substance use.  *See* 20 C.F.R. § 404.1535; *Drapeau*, 255 F.3d at 1214-15.  Plaintiff's argument that the ALJ was required to complete steps four and five of his analysis after finding plaintiff disabled at step three is not supported by the Social Security regulations or applicable case law. *See id*.

Plaintiff also challenges the ALJ's finding that plaintiff's testimony regarding the intensity, persistence, and effects of his impairments was not fully credible.[6]  Docket

---

[6]Plaintiff argues that the ALJ erred in finding that plaintiff lacked credibility because he had a "pecuniary interest in the outcome of this disability claim."  Docket No. 14 at 28 (citing R. at 21).  Since all claimants have a pecuniary interest in receiving benefits, the fact of applying for benefits is not, on its own, a basis for finding that a claimant's credibility is compromised.  *Compare Ratto v. Sec'y, Dept. of Health & Human Servs.*, 839 F. Supp. 1415, 1429 (D. Or. 1993) ("If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or their spouse, or friends, or family) would ever be found credible.") *with Gaddis v. Chater*, 76 F.3d 893, 896 (8th Cir. 1996) (upholding ALJ's finding that plaintiff's claim indicated a "strong element of secondary gain" where plaintiff admitted

No. 14 at 23-30 (citing R. at 21-22).  The Court need not reach this issue, however, because the Court finds that the ALJ's conclusion that plaintiff's drug use is a material factor contributing to his disability is not supported by substantial evidence.  In making this determination, the ALJ relied on the following evidence: (1) Dr. Valette found that plaintiff can bathe, dress, do his own laundry, shop, and play sports; (2) Dr. Kalousek found that plaintiff is seriously limited, but not precluded, from getting along with co-workers; (3) plaintiff has worked at "many jobs" since being diagnosed with bipolar disorder at the age of fourteen; (4) plaintiff was able to perform serial 3s, spell "world" backwards, and remember three items after five minutes; (5) plaintiff tested positive for marijuana when he was hospitalized in 2010; (6) Dr. Valette's assessment did not indicate plaintiff was unable to work; (7) plaintiff was able to follow and respond appropriately to questions at the administrative hearing; (8) the ALJ found that plaintiff was not a credible witness; (9) plaintiff's work history prior to the alleged onset of his disability was sporadic; (10) Ms. Sims noted her belief that plaintiff "lies about his symptoms for secondary gain"; (11) Dr. Suyeishi concluded that plaintiff's symptoms are not severe when he is not under the influence of drugs or alcohol; and (12) Dr. Kalousek found that plaintiff had a very good ability to understand short instructions, make simple work decisions, and request assistance when needed.  R. at 19-23.  This evidence–with the exception of the medical opinions of Dr. Suyeishi–does not constitute "medical evidence regarding Plaintiff's mental health impairments when he is abusing alcohol" or drugs and thus cannot serve as a basis for disentangling the impact of

---

to physician that "he can go out and find a minimum wage job at any time, but he is more worried about the future.").

plaintiff's substance abuse from his mental impairments. *Vigil*, 2012 WL 2523037, at

*4; *see also King*, 2010 WL 3720039, at *4; *Kangail*, 454 F.3d at 629; *Abeyta*, 2011 WL

2531256, at *6.

The ALJ accorded only moderate weight to Dr. Kalousek's opinion that alcohol

and substance use do not contribute to plaintiff's mental impairments, despite Dr.

Kalousek's treating relationship with plaintiff, because of the ALJ's conclusion that Dr.

Kalousek "is not fully familiar with the claimant's substance use history." R. at 23. The

ALJ did not cite any evidence in support of this conclusion. Plaintiff testified at the

hearing that he had been truthful with Dr. Kalousek regarding his past drug use and his

medical marijuana license. R. at 56. Moreover, Dr. Kalousek found plaintiff met the

listing for substance addiction disorders, demonstrating awareness of plaintiff's

substance use. R. at 357. Accordingly, the ALJ did not state a legitimate reason for

according Dr. Kalousek's opinion less than controlling weight, did not apply the relevant

factors listed in 20 C.F.R. § 404.1527(c)(2), and did not apply the proper standard in

deciding to rely on the opinion of Dr. Suyeishi over that of Dr. Kalousek. *See Hamlin*,

365 F.3d at 1220 n.13. Nor did the ALJ take into account that the opinions of Drs.

Valette and Suyeishi–unlike that of Dr. Kalousek–were developed prior to plaintiff's

2010 hospitalization. *See* R. at 18, 22-23.

In sum, this matter must be remanded so that the ALJ can properly consider any

medical evidence regarding the impact of plaintiff's substance use on his mental

impairments.

18

### III.  CONCLUSION

In light of the Court's decision, it is not necessary to consider plaintiff's remaining arguments.  For the foregoing reasons, it is

**ORDERED** that the decision of the Commissioner that plaintiff was not disabled is REVERSED and REMANDED for further proceedings consistent with this opinion.

DATED March 31, 2014.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge